### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

TYRONE D. TYNER,

    *Plaintiff,*

vs.

    Case No. 20-02632-EFM

PROBASCO LAW, P.A.,

    *Defendant.*

### MEMORANDUM AND ORDER

Plaintiff Tyrone D. Tyner initiated this action against Defendant Probasco Law after receiving from it two communications—namely, a notice of a hospital lien claimed on Plaintiff's personal injury claims arising from motorcycle collision, and an accompanying letter from Defendant. Plaintiff alleges these communications violated the Kansas Consumer Protection Act ("KCPA") and the Fair Debt Collection Practices Act ("FDCPA"). Both parties now move for summary judgment on all of Plaintiff's claims. Because Plaintiff's KCPA claims are unsupported by necessary evidence of the Defendant's intent and knowledge, and because the communications complained of do not implicate the FDCPA, the Court grants summary judgment in favor of Defendant.

## I. Factual and Procedural Background[1]

Plaintiff was injured in a motorcycle collision during the evening of October 18, 2018. An ambulance took Plaintiff to the emergency room at the University of Kansas Hospital[2] in Kansas City, Kansas, where he received treatment for his injuries. Plaintiff was discharged the next day, October 19.

At the time he received this treatment, Plaintiff did not have health insurance. He disclosed as much to Hospital staff. Plaintiff did have automobile insurance at that time, which included both personal injury protection ("PIP") and uninsured motorist benefits. Plaintiff did not disclose this policy at the time of his treatment, but it is unclear whether he was asked about it by Hospital staff. Nor did Plaintiff provide updated insurance information to the Hospital at any time after his treatment.

Five payment accounts were created as a result of Plaintiff's brief stay at the Hospital. Four of these (the accounts ending in -30, -74, -00, -77) were for "professional services" and one (the account ending in -18) was for the Hospital's "facility services." The initial charges for each of these accounts are as follows:

    Account ending in -30:  $575.00
    Account ending in -74:  $18.00
    Account ending in -00:  $33.00
    Account ending in -77:  $841.00
    Account ending in -18:  $38,838.16

---

[1] The Court lays out the uncontroverted facts as relevant to the parties' cross motions for summary judgment. In ruling on each motion, the Court views the uncontroverted facts in the light most favorable to that motion's nonmoving party.

[2] At the outset, the Court notes that the parties repeatedly dispute the legal characterization of the Hospital. Defendant asserts that what is colloquially referred to as the University of Kanss Hospital is actually made up two legal entities, the University of Kansas Hospital Authority and the University of Kansas Physicians. Plaintiff vehemently disputes this. For the purposes of the Court's ruling today, whether or not the "Hospital" is actually two separate legal entities is immaterial. Therefore, the Court simply refers to the actions and policies of the "Hospital."

These amounts were automatically reduced because of the Hospital's "self-pay" discount. The Hospital automatically applies a discount—in the amount of 70% for hospital facility services and 40% for professional services—for patients who meet certain qualifications. "Self pay patients" include "uninsured patients, regardless of residency." The Hospital's policy defines an "uninsured" patient as a "[p]atient [who] has no form of third party assistance to assist with financial responsibility for medical services." With the application of the self-pay discount, those amounts were reduced to the following:

> Account ending in -30:  $345.00
> Account ending in -74:  $10.80
> Account ending in -00:  $19.80
> Account ending in -77:  $504.60
> Account ending in -18:  $11,651.45

Over the next several months, the Hospital sent various bills to Plaintiff seeking to recover some combination of these amounts.

Sometime after his treatment, Plaintiff hired an attorney to prosecute his personal injury claim arising out of the motorcycle collision. Plaintiff's automobile insurance carrier, GEICO, then paid out several amounts related to Plaintiff's PIP benefits. The first was sent to the Hospital in March 2019 in the amount of $1,130.97, and was designated by GEICO to be applied to the account ending in -30. The Hospital applied that payment to the account ending in -18. In April 2019, GEICO sent a second check in the amount of $3,369.03. This amount was designated to be applied, and was actually applied, to the account ending in -18. The parties controvert whether this amount was meant to be "payment in full" for the services provided under account -18. Later that April, Plaintiff settled with GEICO for the $25,000 uninsured motorist policy limit. Plaintiff did not pay any of this amount to the Hospital.

In October 2019, the Hospital filed a limited action lawsuit against Plaintiff in Wyandotte County, Kansas District Court, seeking, at that time, to recover $870.00 plus interest.[3]  Plaintiff and Defendant dispute whether this action was limited to the professional services accounts or rather encompassed the whole of Plaintiff's remaining financial obligations to the Hospital.  In any event, the next month, the Hospital partially reversed its application of the $1,130.97 payment to account -18 and used part of this amount to zero out the remaining professional services balances. Thus, in November 2019, the only remaining account balance related to Plaintiff's treatment was $8,021.45 on account -18.

Plaintiff filed a counterclaim in the limited action lawsuit.  Generally speaking, he sought certification of a class action against the Hospital for alleged violations of the KCPA.  In response to this counterclaim, Hospital staff reached out to Defendant, specifically Defendant's sole attorney, E. Lou Bjorgaard Probasco, to ask if she could assist in locating an attorney to defend against the counterclaim.  Probasco agreed, and on November 8, 2019, entered her appearance in the limited action lawsuit.

As Probasco reviewed the pleadings and billing documents related to the Hospital's limited action against Plaintiff, she arrived at several conclusions: (1) that the limited action lawsuit only concerned the Hospital's interest in the professional services accounts, and not the facility services account; and (2) that Plaintiff was not entitled to have received a self-pay discount under the Hospital's policy.  With these conclusions in hand, Defendant filed, in Wyandotte County District Court, a Notice of Hospital Lien ("Notice") in the amount $35,208.16 on "any and all claims" of Plaintiff on account of his injuries due to the motorcycle collision.

---

[3] The petition in the limited action was amended in August 2020 to seek recovery of $8,001.05 allegedly still owed by Plaintiff.

Hospital liens are permitted under Kansas law.[4] The lien must set forth the amount of the hospital's claims, the name of the injured person, the date of the accident, and the name and location of the hospital.[5] Such liens are limited "to the amount of the reasonable and necessary charges" made by the hospital for the patient's treatment.[6] A hospital lien will not be effective unless a notice is filed in the district court of the county in which the hospital is located "prior to the payment of any moneys" to the injured patient, and a copy of the notice is sent to the patient.[7]

Probasco was familiar with these provisions of Kansas law at the time she filed the Notice in Plaintiff's case, as she avers that she has filed hospital liens on occasion as part of her practice. Probasco's practice at Defendant law firm also includes some consumer debt collection matters. In 2019, Defendant opened 61 new placements involving consumer debt collection. That year, Defendant's consumer debt collection practice accounted for 10.6% of its gross revenue. Defendant had also previously represented the Hospital in a variety of matters and had a standing contingency fee agreement in place. Defendant disputes that such agreement applied to its filing of the hospital lien in Plaintiff's case.

The hospital lien was in the amount of $35,208.16. Defendant arrived at this number by taking the original amount of $38,838.16 for account -18, less the portions of the two GEICO PIP payments allocated to account -18. All other accounts had been "zeroed out" at that time. Defendant filed the Notice in Wyandotte County District Court on November 8, 2019, and sent Plaintiff a copy of the notice and an accompanying letter the same day. The Notice read as follows:

---

[4] K.S.A. § 65-406.

[5] *Id.* § 65-407.

[6] *Id.* § 65-406.

[7] *Id.* § 65-407.

> You are hereby notified that the Kansas University Hospital Systems . . . claims a lien upon any and all claims, counterclaims, demands, suit, or rights of action of Tyrone D. Tyner . . . on account of personal injury to person on or about the 19th day of October 2018, as a result of the negligence or other wrongful act of any person . . . .

The Notice also provided that the "unpaid cost of the services furnished to date is . . . $35,208.16." Defendant's letter to Plaintiff contained a header that read, in part, "Balance Due: $35,208.16." The body of the letter read: "[w]e are assisting University of Kansas Hosp. Authority in obtaining payment based upon the hospital lien previously filed in this matter. Please provide a status of the pending claim and an estimate of when we can expect payment." Defendant sent these two communications as part of a single mailing. At the time, Defendant did not know that Plaintiff had made and settled a personal injury claim.

Plaintiff did not receive the November 8 mailing, and it was returned to Defendant as unclaimed. Defendant re-sent the Notice and letter by regular mail on December 26, 2019. This time, Plaintiff received the mailing. He was upset when he received the Notice and letter because he believed, and apparently still believes, that his wages may be garnished because of the hospital lien. Plaintiff's wages have not been garnished as a result of the lien, nor has he made any payments to the Hospital after receiving the Notice of Hospital Lien.

Plaintiff initiated this action against Defendant, seeking redress for these two communications. He believes Defendant violated the KCPA and FDCPA by sending him the Notice and its accompanying letter. Both Plaintiff and Defendant now seek summary judgment on all of Plaintiff's claims.

## II.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law.[8]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[9]  The movant bears the initial burden of proof, though "a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[10]  "Such a movant may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."[11]  The nonmovant must then bring forth "specific facts showing a genuine issue for trial."[12]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[13]  The court views all evidence and draws "reasonable inferences therefrom in the light most favorable to the nonmoving party."[14]

The Court applies this same standard to cross motions for summary judgment.  Each party bears the burden of establishing that no genuine issue of material fact exists and entitlement to

---

[8] Fed. R. Civ. P. 56(a).

[9] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (quoting *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[10] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[11] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp.*, 477 U.S. at 325).

[12] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (quoting *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999)).

[13] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[14] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (quoting *N. Tex. Prod. Credit Ass'n v. McCurtain Cty. Nat'l Bank*, 222 F.3d 800, 806 (10th Cir. 2000)).

judgment as a matter of law.[15]  "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[16]  But where the cross motions overlap, the Court may permissibly address the legal arguments together.[17]  Each motion is viewed in the light most favorable to its nonmoving party.[18]

### III.    Analysis

All of Plaintiff's claims are at issue on these cross-motions for summary judgment. Plaintiff alleges that Defendant violated the KCPA, specifically K.S.A. § 50-626, which prohibits a supplier from engaging in deceptive acts practices in connection with a consumer transaction. Plaintiff also alleges that Defendant violated the FDCPA by (1) misrepresenting the amount of the alleged debt, (2) communicating directly with Plaintiff even though Defendant knew him to be represented by counsel, and (3) attempting to collect a debt not authorized by law or agreement. The Court examines each of these in turn.

**A.    KCPA Claims**

K.S.A. § 50-626(a) prohibits a "supplier" from engaging "in any deceptive act or practice in connection with a consumer transaction."  Subsection (b) enumerates certain acts and practices that qualify as deceptive, including "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact"[19] and "falsely stating, knowingly or with reason to know, that a consumer transaction involves consumer rights, remedies

---

[15] *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[16] *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (citation omitted).

[17] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted).

[18] *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

[19] K.S.A. § 50-626(b)(2).

or obligations."[20]  Plaintiff relies on these two subsections alone in attempting to establish that Defendant engaged in a deceptive act or practice in sending him the Notice and letter.

A "willful" act is one done with "an intent to harm the consumer."[21]  This is a demanding standard, and thus "[i]t is not sufficient to allege that the supplier willfully gave information that later proved to be false."[22]  Rather, to show willful conduct—and to survive summary judgment—"a consumer must provide some indication that would allow a reasonable jury to conclude that the supplier had a designed purpose to do wrong, *i.e.*, that the supplier intended to give the information even though the supplier knew that it was false."[23]  Similarly, the claim under § 50-626(b)(8) requires Plaintiff to provide enough evidence for a reasonable jury to conclude that Defendant knew or had reason to know it was falsely representing the amount of the lien the Hospital was entitled claim.  Thus, evidence of Defendant's knowledge of the falsity of its representations, is crucial at this stage.

But despite Plaintiff's best efforts, the record is completely devoid of any evidence that Defendant *knew* $35,208.16 was the wrong amount and still chose to file the hospital lien in that amount.  Plaintiff cites to the controverted fact that the second GEICO PIP payment was designated as "payment in full," and suggests that Defendant must then have been trying to deprive Plaintiff "of the benefit of his bargain" with GEICO by filing the lien.  Even if the Court were to assume the second PIP payment was payment in full of Plaintiff's balance due on account -18, there is still no evidence that Defendant *knew* this to be the case, and that account -18 should, like the other

---

[20] *Id.* § 50-626(b)(8).

[21] *Unruh v. Purina Mills, LLC*, 289 Kan. 1185, 221 P.3d 1130, 1139 (2009).

[22] *Via Christi Reg'l Med. Ctr., Inc. v. Reed*, 298 Kan. 503, 314 P.3d 852, 865 (2013) (alterations omitted) (quoting *Tufts v. Newmar Corp.*, 53 F. Supp. 2d 1171, 1179 (D. Kan. 1999)).

[23] *Id.* (alterations omitted) (quoting *Tufts*, 53 F. Supp. 2d at 1179).

accounts, be treated as "zeroed out." It is uncontroverted that Plaintiff's account balances, made available to Defendant by the Hospital once Probasco entered her appearance in the limited action lawsuit, still showed a "Patient Due" amount of $8,021.45, reflective of the self-pay discount and the two PIP allocations, at the time Defendant filed the lien.

Plaintiff next contends that because he was only billed for this reduced amount under account -18, Defendant wrongfully filed a lien in the full amount of the original charges (less the PIP payments). But again, the issues of Defendant's knowledge and intent must take center stage. In filing the lien, Defendant concluded that the Hospital's self-pay discount was improperly applied to Plaintiff at the outset, and thus disregarded that discount in determining the amount of the lien. The record available suggests that Defendant was correct in this conclusion, as well as that this decision was in harmony with the Hospital's practice, in filing a hospital lien, to disregard the internal self-pay adjustment and to file the lien in the full amount of the original charges.[24]

Plaintiff attempts to put these facts in dispute by asking that the Court disregard the affidavit of David Geiss, the basis for these two facts. He argues that the information is facially outside Geiss's personal knowledge and that the affidavit itself is conclusory and self-serving. The Court disagrees. Geiss's declaration shows that he is a Patient Accounting Representative II for the University of Kansas Hospital Authority, the entity related to the hospital facility charges in account -18. Thus, the applicability of the self-pay discount on this account would reasonably be within the realm of his personal knowledge, as would the entity's policies regarding the use of

---

[24] *See, e.g.*, Decl. of David Geiss, Doc. 67-1, at ¶ 7 ("If a potential third-party may be liable to the patient, the self-pay discounts do not apply. For example, in the case of a motor vehicle accident, the self-pay discount does not apply to the other party to the accident."); *Id.* at ¶ 10 ("When a hospital lien is filed by UKHA, the amount of the charges is not reduced by the self-pay discount."); Pl.'s Ex. D., Doc. 57-4, at 1 (defining uninsured patient as a patient with "no form of third party assistance to assist with financial responsibility for medical services").

hospital liens to collect from persons liable to injured patients. The Court finds no reason to disregard this affidavit as "self-serving," as neither Geiss nor the Hospital have an interest in this lawsuit. And the affidavit states more than mere legal conclusions. The Court therefore will not disregard Geiss's affidavit at this stage.

To survive summary judgment, Plaintiff must come forward with some evidence that Defendant *knew* the self-pay discount properly applied to Plaintiff and still chose to disregard it when calculating the amount of the lien. "[W]illful conduct" requires some "indication that would allow a reasonable jury to concluded that [Defendant] had a designed purpose to do wrong, i.e., that [Defendant] intended to give the information even though [Defendant] knew it was false."[25] The only evidence he offers is the bare fact that the Hospital originally applied the self-pay discount to his account -18, and that Defendant knew this. This is insufficient. No reasonable jury could conclude on this slim basis that Defendant acted with an intent to harm Plaintiff or with a knowledge of the falsity of the amount of the lien.

Finally, though Plaintiff cites Defendant's contingency fee agreement with the Hospital as evidence that Defendant had a "motive" to increase the amount of the lien, this alone would not be sufficient for a reasonable jury to conclude Defendant willfully or knowingly misled Plaintiff. Evidence of a possible financial motive is not the same as evidence of Defendant's intent or designed purpose to do wrong, which is required for Plaintiff to survive summary judgment. Because Plaintiff has provided no evidence of Defendant's willfulness under subsection (b)(2) and no evidence of Defendant's knowledge under (b)(8), the Court grants summary judgment in favor of Defendant on those claims.

---

[25] *Via Christi*, 314 P.3d at 865 (quoting *Tufts*, 53 F. Supp. 2d at 1179).

**B.     FDCPA Claims**

*1.     Defendant Is a Debt Collector.*

A foundational matter for Plaintiff's FDCPA claims is whether Defendant qualifies as a "debt collector," because a defendant may only be held liable for violating the FDCPA if that defendant meets the definition of a debt collector.[26] Subject to several exclusions, the FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."[27] This definition provides two alternative avenues to obtain "debt collector" status under the FDCPA: "(1) engaging in debt collection as the principal purpose of the entity's business and (2) engaging in debt collection regularly."[28] Plaintiff does not contend that debt collection was the "principal purpose" of Defendant's law practice, which limits the question to whether Defendant engaged in debt collection "regularly."

In considering whether a defendant engages in debt collection "regularly," the Tenth Circuit has directed courts to look to the following factors:

> (1) the absolute number of debt collection communications issued, and/or collection-related litigation matters pursued, over the relevant period(s), (2) the frequency of such communications and/or litigation activity, including whether any patterns of such activity are discernible, (3) whether the entity has personnel specifically assigned to work on debt collection activity, (4) whether the entity has systems or contractors in place to facilitate such activity, and (5) whether the activity is undertaken in connection with ongoing client relationships with entities that have retained the lawyer or firm to assist in the collection of outstanding consumer debt obligations.

---

[26] *James v. Wadas*, 724 F.3d 1312, 1315–16 (10th Cir. 2013).

[27] 15 U.S.C. § 1692a(6).

[28] *Folkers v. Simmons*, 2015 WL 1537989, at *4 (D. Kan. 2015) (citing 15 U.S.C. § 1692a(6)).

> Facts relating to the role debt collection work plays in the practice as a whole should also be considered to the extent they bear on the question of regularity of debt collection activity (debt collection constituting 1% of the overall work or revenues of a very large entity may, for instance, suggest regularity, whereas such work constituting 1% of an individual lawyer's practice might not).[29]

Plaintiff and Defendant dispute whether Defendant has a special department or staff responsible specifically for debt collection activity, as well as whether Defendant sends quarterly status communications to debtors. But it is undisputed that Defendant opened 61 new consumer debt collection files in 2019, that it had other "legacy" files, or matters predating 2011, where a debtor was continuing to make payments on the debt, and that together, this debt collection activity accounted for 10.6% of Defendant's gross revenue in 2019. Based on this, the Court concludes that Defendant is a "debt collector" and may be subject to liability under the FDCPA.

        *2.      The Notice and Letter Were Not Communications within the Scope of the FDCPA.*

A second foundational question, before this Court can proceed to analyze the substance of Plaintiff's FDCPA claims, is whether the FDCPA even applies to the communications at issue. The FDCPA "does not apply to *every* communication between a debt collector and a debtor."[30] For instance, the statutory sections on which Plaintiff relies apply to communications "in connection with the collection of any debt"[31] or actions "to collect or attempt to collect any debt."[32] "In order for a communication to be in connection with the collection of a debt, 'an animating

---

[29] *James*, 724 F.3d at 1317–18 (quoting *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 374 F.3d 56, 62–63 (2d Cir. 2004))

[30] *Davis v. Midland Credit Mgmt., Inc.*, 2016 WL 7117185, at *4 (D. Kan. 2016) (citing *Grden v. Leikin Ingber Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011); *Gburek v. Litton Loan Serv. L.P.*, 614 F.3d 380, 384–85 (7th Cir. 2010)).

[31] 15 U.S.C. §§1692c(a), 1692e.

[32] 15 U.S.C. § 1692f.

purpose of the communication must be to induce payment by the debtor.' "[33]  The "animating purpose" of a communication is determined on an objective basis, considering all the surrounding facts and circumstances.[34]

Other courts have addressed situations in which a notice of a hospital lien was alleged to have violated the FDCPA.  In *Hamilton v. Avectus Health Care Solutions*,[35] the court was "not persuaded by Hamilton's argument the liens were 'designed to induce Mr. Hamilton to settle his debt.' "[36]  Rather, the court found that "every indication is that the purpose of Avectus's communications with Hamilton and his representatives was to collect and process information about third-party payer claims."[37]  The court placed importance on the fact that, while the lien stated an "amount due," it did not include a demand for payment or any payment details and identified Hamilton's insurance carriers as the entities liable for his damages.[38]

Similarly, the court in *Smith v. University Community Hospital*[39] found that neither a notice of a hospital lien nor an accompanying letter constituted "communications connected or related to debt collection."[40]  The court placed emphasis on the fact that

> [n]either the notification letter nor the 'Hospital Claim of Lien' states how Mr. Smith can pay off Community Hospital's lien.  Neither document states fees or costs will

---

[33] *Davis*, 2016 WL 7117185, at *4 (citing *Grden*, 643 F.3d at 173; *Gburek*, 614 F.3d at 385).

[34] *Gburek*, 614 F.3d at 385 (citation omitted) (noting that "the standard for evaluating whether a communication is made in connection with the collection of a debt is an objective one").

[35] 2015 WL 5693610 (N.D. Ala. 2015).

[36] *Id.* at *7.

[37] *Id.*

[38] *Id.*

[39] 2019 WL 118045 (M.D. Fla. 2019).

[40] *Id.* at *4.

be assessed until the lien is paid off. Neither document states it is an attempt to collect a debt. And neither document states the sender is acting as a debt collector.[41]

Further, the letter, though it stated the "Amount of Charges," did not characterize that amount as a debt.[42] The letter included several disclaimers stating the lien did not constitute a judgment against the plaintiff and was not a lien against him personally.[43]

Plaintiff highlights these disclaimers in an effort to differentiate his case from the cited cases. Neither the notice of the lien nor the accompanying letter from Defendant included direct statements that the lien was not against Plaintiff personally or that the lien and letter were not attempts to collect a debt from Plaintiff. But the absence of these statements, while relevant, is not determinative of whether, objectively, the Notice and letter had the animating purpose of inducing Plaintiff to pay.

The Notice of Hospital lien, a copy of which was sent to Plaintiff, states

> You [Plaintiff] are hereby notified that the Kansas University Hospital Systems . . . claims a lien upon any and all claims, counterclaims, demands, suit, or rights of action of Tyrone D. Tyner . . . on account of personal injury to person on or about the 19th day of October 2018, as a result of the negligence or other wrongful act of any person.

The Notice also provided that the "unpaid cost of the services furnished to date is . . . $35,208.16." Immediately, it stands out that that while the Notice details the "unpaid costs of the services furnished to date," it does not characterize this amount as a debt, does not demand payment, and does not provide any details how the Plaintiff could pay if he were so inclined. Further, the Notice

---

[41] *Id.* at *5.

[42] *Id.* at *4.

[43] *Id.*

makes clear that the lien is against any "claims, counterclaims, demands, suit, or rights of action" Plaintiff may have had on account of his accident, and is not against Plaintiff personally.

Defendant's letter to Plaintiff, which the Court views in concert with the Notice as it arrived in the same mailing, contained a header that read, in part, "Balance Due: $35,208.16." The body of the letter read: "[w]e are assisting University of Kansas Hosp. Authority in obtaining payment based upon the hospital lien previously filed in this matter. Please provide a status of the pending claim and an estimate of when we can expect payment." Requesting an "estimate of when we can expect payment is not, in the Court's view, the same as a demand for payment given that the preceding language makes clear that such "payment" is "based upon the hospital lien" on any of his pending legal claims on account of the accident. Nor does not provide details of how a payment could be made. The letter clearly references the hospital lien and seeks information regarding any pending claims of Plaintiff.

The foregoing indicates that Plaintiff's interpretation of the Notice and letter is objectively unreasonable. Plaintiff states that he interpreted the Notice and letter as an indication that his wages would be garnished. Nothing in either the Notice or the letter gives an indication that Plaintiff's wages were in danger of being garnished if he did not pay. Plaintiff responds that because he is not familiar with the vagaries of hospital liens, he assumed they were similar to other liens, such as a mechanic's lien, and applied to him personally, and states that the "least sophisticated consumer" would have assumed so as well. The Court notes that the Tenth Circuit has never adopted the "least sophisticated consumer" standard, though it has recognized, in an unpublished opinion, that other courts have applied that standard to FDCPA claims.[44] Nor has it

---

[44] *Ferree v. Marianos*, 1997 WL 687693, at *1 (10th Cir. 1997) (citations omitted).

recognized that the standard applies to the question of whether a communication is "in connection with the collection of a debt," and other courts have explicitly held that the standard does not apply to that question.[45] But even if the Court were to apply the "least sophisticated consumer" standard in this case, it is presumed that this "least sophisticated consumer" possesses "a rudimentary amount of information about the world and a willingness to read a collection notice with some care."[46] And though the standard protects the "naïve and credulous," it also "protects debt collectors against liability for unreasonable misinterpretations of collection notices."[47]

Plaintiff's interpretation of the letter as an indication that his wages would be garnished is just such an unreasonable interpretation. There was nothing in the Notice or letter to support this interpretation, nor any indication of how such garnishment would be accomplished. Further, as noted above, the notice and letter, read together, make clear that the lien was taken on any pending personal injury claims Plaintiff may have had. Plaintiff quite simply drew his interpretation out of thin air, and his purported fears would have assuredly been assuaged by a careful reading of the Notice. Thus, his interpretation of the Notice and letter does little to support his claim that its animating purpose was to induce him to pay a debt.[48]

---

[45] *Hamilton*, 2015 WL 5693610, at *6; *see also Caceres v. McCalla Raymer, LLC*, 755 F.3d 1299, 1301–03 (11th Cir. 2014) (examining the content of a letter objectively to determine if it was an initial communication under the FDCPA and applying the least sophisticated consumer standard to the question of if the communication was false, deceptive, or misleading).

[46] *Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993).

[47] *Id.*

[48] Also relevant, Kansas law requires that a copy of the hospital lien be furnished to the patient. *See* K.S.A. § 65-407. This context provides a strong indication that at least one purpose of Defendant's mailing of a copy of the lien to Plaintiff was to comply with Kansas law. Of course, an action may be animated by more than one purpose. But as noted above, Plaintiff has provided little evidence that an animating purpose of the notice was to induce him to pay his debt to the Hospital.

There is no indication that Defendant's letter had such an animating purpose. Plaintiff relies on the fact that the letter states a "Balance Due" of $36,208.16, asked when payment could be expected, and contained no disclaimers that the letter is not a collection notice. Plaintiff's piecemeal approach at analyzing the letter is unsatisfactory. It is in analyzing the letter as a whole, and in conjunction with the Notice, that it becomes clear the animating purpose of the letter was not to induce payment *from Plaintiff*. The letter makes clear that it is sent in connection with the hospital lien which, as stated before, explicitly states that it is a lien on any pending claims of Plaintiff, and not on Plaintiff himself. The letter asks about the status of any pending claims, and only then asks when payment can be expected. It does not state that payment is expected *from Plaintiff*, but rather indicates by its structure that payment is expected from any pending claims. Plaintiff's interpretation that this meant his wages would be garnished is objectively unreasonable, and is not enough to support his FDCPA claims.

The Court concludes that neither the Notice nor letter had the animating purpose of inducing payment from Plaintiff. Rather, "[e]very indication is that the purpose of such communications is to collect and process information about third-party payer claims and not to induce the consumer himself to pay his debt to the hospital."[49] Because neither of the communications about which Plaintiff complains fall within the ambit of the FDCPA, those claims must be dismissed.

**IT IS THEREFORE ORDERED** that Defendant's (Doc. 53) Motion for Summary Judgment is **GRANTED.** Plaintiff's (Docs. 57, 62) Motions for Summary Judgment are **DENIED**.

---

[49] *Lange v. Prof'l. Account Servs., Inc.*, 2020 WL 1302512, at *7 (D. Alaska 2020) (internal quotation marks omitted) (quoting *Hamilton*, 2015 WL 5693610, at *4).

This case is closed.

**IT IS SO ORDERED.**

Dated this 12th day of May, 2022.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

-19-